FILED
AUG 2 3 2016
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GILBERT P. HYATT, | |
| Plaintiff, | |
| v. | Civil Action No. 09-1869 (RCL) |
| MICHELLE K. LEE, | FILED UNDER SEAL |
| Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, | |
| Defendant. | |

## MEMORANDUM OPINION

This case relates to U.S. patent application 08/472,062 (the '062 application) and is brought under 35 U.S.C. § 145. This case is similar to several other § 145 claims filed by the same plaintiff. The related cases in front of this Court include 03-cv-901, 05-cv-2310, 09-cv-1864, and 09-cv-1872. This opinion should be read in conjunction with the memorandum opinions filed in those cases as the arguments and legal positions taken by the parties often overlap or are variants of each other. In this particular case the parties have filed cross motions for summary judgment. For the reasons specified below, plaintiff's motion is denied and defendant's motion is granted in part and denied in part.

1

I.  **BACKGROUND**

The '062 application is a continuation application that can be traced back to U.S. patent application 06/662,211 (the '211 application). A54.[1] The '062 application, entitled "Improved Memory Architecture Having a Multiple Buffer Output Arrangement," A42-43, and the '211 application, entitled "A Buffer Memory System," A43, have the same specification but different claims. Mem. P. & A. Supp. Def.'s Mot. Summ. J. 4, ECF No. 45-1.

The '062 application was one of over forty applications Mr. Hyatt filed on June 6, 1995, all based on the same specification. Mem. P. & A. Supp. Def.'s Mot. Summ. J. 7; *see also*, Mem. Op. at 8 *Hyatt v. Lee* (No. 03-cv-901), ECF No. 93 (discussing the impact of the General Agreement on Tariffs and Trade (GATT) on patents). Mr. Hyatt ultimately sought the issuance of over 10,000 claims based on these applications. Mem. P. & A. Supp. Def.'s Mot. Summ. J. 7. In the course of pursuing this particular patent, Mr. Hyatt added, amended, and canceled claims until, in 1997, the Examiner rejected all 78 pending claims. *Id.* at 5.

Mr. Hyatt appealed to the Board of Patent Trials and Interferences (Board),[2] which overturned some of the Examiner's rejections and affirmed others. *Id.* at 6. Mr. Hyatt then brought the present action under 35 U.S.C. § 145. At this point, Mr. Hyatt is not challenging the Board's findings as to 19 claims: 17, 18, 20, 72, 74, 81, 85, 125-131, 134, 135, 137, 143, and 147. Mem. P. & A. Supp. Gilbert P. Hyatt's Mot. Summ. J. 9, ECF No. 51. This leaves 15 pending claims wherein the Board affirmed the Examiner's position that the claims were not patentable. These claims fall into two categories: 1) "product claims" which discuss the act of "making a product"

---

[1] Citations to the administrative record take the form of the letter "A" followed by the page number or numbers provided in the joint administrative record, ECF No. 69.
[2] The Board is now referred to as the Patent Trial and Appeal Board pursuant to the Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 3(j)(1), 125 Stat. 284, 290 (2011).

and were rejected for lack of written description support; and 2) a rejection for obviousness-type double patenting.

First, fourteen claims were rejected for lack of written description support. These claims recited the act of "making a product." Mr. Hyatt originally argued to the Board that the apparatus in the disclosure was itself the "product" in question. A722. The Board rejected this, concluding that Mr. Hyatt was "improperly read[ing] 'product' onto the circuitry that performs the claimed process rather than on[to] something made as one step or act of the claimed process." A1336-1337. Mr. Hyatt requested a rehearing and argued that the "products" in question could be signals or images, an argument the Board rejected as untimely. A1378, A1397. In this litigation he has produced an expert who has provided several examples of products he argues satisfy the written description requirement. Mem. P. & A. Supp. Gilbert P. Hyatt's Mot. Summ. J. 15. Defendant disputes that the claimed products would have been understood as products by one of ordinary skill in the art at the time of the invention, Mem. P. & A. Supp. Def.'s Opp'n Gilbert P. Hyatt's Mot. Summ. J. 17, ECF No. 59, and further argues that the examples provided are legally insufficient. *Id.* at 12-17.

Additionally, claim 45 was rejected for obviousness-type double patenting as the Board found that it was not patently distinct from another claim in a copending application. A1343. A rejection of this type allows the applicant to file a "terminal disclaimer." A532. Such a disclaimer limits a patent term by preventing it from extending beyond the term of another claim with which it overlaps. Mr. Hyatt elected not to file a terminal disclaimer and argues that this claim is distinct from the claim in the copending application.

## II. LEGAL STANDARDS

### a. Summary Judgment

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is a fact that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In making a summary judgment determination, the court must believe the evidence of the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. However, "the mere existence of a scintilla of evidence in support of the non-moving party" is insufficient to create a genuine dispute of material fact. *Id.* at 252. Instead, evidence must exist on which the jury could reasonably find for the non-moving party. *Id.*

### b. Written Description Requirement

Patent applications must include a written description of the claimed invention. 35 U.S.C. § 112. The Federal Circuit has explained "[t]he purpose of the 'written description' requirement is broader than to merely explain how to 'make and use'; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991). The rationale for the written description requirement is clear:

> '[A] patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion.' Requiring a written description of the invention limits patent protection to those who actually perform the difficult work of 'invention'—that is, conceive of the complete and final invention with all its claimed limitations—and disclose the fruits of that effort to the public. . . . It is part of the *quid pro quo* of the patent grant and ensures that the public receives a

4

meaningful disclosure in exchange for being excluded from practicing an invention for a period of time.

*Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353 (Fed. Cir. 2010) (internal citations omitted). Put another way, "[t]he essence of the written description requirement is that a patent applicant, as part of the bargain with the public, must describe his or her invention so that the public will know what it is and that he or she has truly made the claimed invention." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 (Fed. Cir. 2014).

Whether or not there is sufficient written description is ultimately one of fact. *See GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 729 (Fed. Cir. 2014). However, it is nonetheless amenable to summary judgment. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008) ("Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party.").

As an initial matter, the lens through which we examine claims for written description support is of one skilled in the art at the time of the claimed invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). Section 112's twin requirements, of (1) describing the manner and process of making and using the full scope of the invention, and (2) describing the invention sufficiently to convey the patentee had possession of the claimed invention, are viewed in this same light and "usually rise and fall together." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005). Here, with respect to the "time of the claimed invention," the pertinent date is October 1984—the priority date for the '062 application.

In determining if there is sufficient written description, courts do not use bright-line rules. *Ariad*, 598 F.3d at 1351. Courts are not, however, without basic principles or precedents. As noted above, in general "the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* This does not require an applicant to detail each and every instantiation of a claimed invention. *Id.* at 1352 ("[T]he description requirement does not demand any particular form of disclosure . . . or that the specification recite the claimed invention *in haec verba*."). This is not without limitation though, as USPTO guidelines, adopted by the court, require "disclosure of sufficiently detailed, relevant identifying characteristics . . . i.e., complete or partial structure, other physical and/or chemical properties, functional characteristics when coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002). To provide written description for a genus, "[o]ne needs to show that one has truly invented the genus, i.e., that one has conceived and described sufficient representative species encompassing the breadth of the genus. Otherwise, one has only a research plan, leaving it to others to explore the unknown contours of the claimed genus." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d at 1300.

While the doctrines of written description and enablement are distinct, determining if there is sufficient written description support for a broadly claimed invention can be "analogous to enablement of a genus under § 112, ¶ 1, by showing the enablement of a representative number of species within the genus." *Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1569 (Fed. Cir. 1997); *see also Kennecott Corp. v. Kyocera Intern., Inc.*, 835 F.2d 1419, 1421 (Fed. Cir. 1987) ("These requirements may be viewed separately, but they are intertwined."). One

such case addressing this "genus and representative species" concept is *Application of Angstadt*, 537 F.2d 498 (C.C.P.A. 1976). There, the claimed invention was using a hexaalkylphosphoramide and a transition metal salt to catalyze the oxidation of secondary or tertiary alkylaromatic hydrocarbons to form hydroperoxides. *Id.* at 503. The applicant did not disclose every catalyst that could work, as that would necessitate thousands of examples. Instead, they provided 40 working examples. *Id.* at 502-03. The Federal Circuit explained that, "[s]ince appellants have supplied the list of catalysts and have taught how to make and how to use them, we believe that the experimentation required to determine which catalysts will produce hydroperoxides would not be undue and certainly would not 'require ingenuity beyond that to be expected of one of ordinary skill in the art.'" *Id.* at 503 (quoting *Fields v. Conover*, 443 F.2d 1386, 1390-91 (C.C.P.A. 1971)).

### c. Double Patenting

The doctrine of double patenting prevents an individual from obtaining multiple valid patents on the same invention or an obvious variation of the invention. *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985). Naturally, a double patenting rejection occurs when there are multiple claims the USPTO has determined are for the same invention or are obvious variations of the same invention. If these claims could be individually patented, it could have the effect of improperly extending the patent term over a claimed invention. While the doctrine of double patenting is derived from 35 U.S.C. § 101, "obviousness type" double patenting is a judicially created doctrine based on public policy. *Id.* The United States Court of Customs and Patent Appeals noted that the doctrine is "very long standing" and "operates in the public interest" as "[t]he public should . . . be able to act on the assumption that upon expiration of the patent it will be free to use not only the invention claimed in the patent but also any modifications or variants thereof which would

have been obvious to those of ordinary skill in the art at the time the invention was made." *Application of Zickendraht*, 319 F.2d 225, 232 (C.C.P.A. 1963).

To determine if there is obviousness-type double patenting, courts have used a "one-way" test. *In re Berg*, 140 F.3d 1428 (Fed. Cir. 1998). Under this test, "if the scope of the application and the patent claims is not identical, the court must ask whether the former defines merely an obvious variation of the latter." *Id.* at 1432. While this is not the only test, other tests apply only in "certain unusual circumstances." *Id.*

An applicant whose claim has been rejected for double patenting may nonetheless be given a patent if he or she files a terminal disclaimer. Such a filing disclaims "'any terminal part of the term . . . of the patent,' thereby guaranteeing that the second patent would expire at the same time as the first patent." *In re Longi*, 759 F.2d at 894. That is, as long as the applicant agrees to limit the term of subsequent patents that are obvious variants of the invention so they do not exceed the patent term of the original invention, they may be given a patent. In cases where the variants are all pending, such a rejection is "provisional" as it is conditioned on the pending claims ultimately being patented. Manual of Patent Examining Procedure ("MPEP") § 804 at Chart I-B and ¶¶ 8.33, 8.35, ECF No. 46-1.

### III. CLAIMS REJECTED FOR LACK OF WRITTEN DESCRIPTION SUPPORT

Fourteen claims at issue, claims 144-46, 148-50, and 155-62, were rejected for lacking written description support under 35 U.S.C. § 112. A1337. To satisfy the written description requirement under § 112, one must: (1) "describe the manner and process of making and using the invention so as to enable a person of skill in the art to make and use the full scope of the invention without undue experimentation" and, (2) "describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the

8

application, i.e., that that the patentee invented what is claimed." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d at 1344-45.

These claims are "product claims," that is, they recite the act of "making a product." These claims, and the arguments the parties make, are very similar to those in case 09-cv-1864, also before this Court. This memorandum opinion should be read in conjunction with the memorandum opinion filed in that case. Here, as there, the claims follow the general pattern of "a process ... as set forth in claim *X*, further comprising the act of making a product." A925-28. As in 09-cv-1864, Mr. Hyatt has provided examples of products and argues this provides written description support to the claims in question. Mem. P. & A. Supp. Gilbert P. Hyatt's Mot. Summ. J. 15 ("The examples include a video signal, a disk storing a database, and a display of a video signal.").

Defendant argues both that one of ordinary skill in the art would not have considered many of these examples to be products and that the examples are legally insufficient to cover the full scope of the claims. Mem. P. & A. Supp. Def.'s Mot. Summ. J. 14-17. For example, claim 162 reads as follows: "[a] process of operating a memory system as set forth in claim 124, further comprising the act of making a product in response to the data decompressed image information." A928. Mr. Hyatt argues that the '062 specification teaches a "disk product," which provides written description support for this claim. Mem. P. & A. Supp. Gilbert P. Hyatt's Mot. Summ. J. 21-22. Defendant disputes that such a thing would have been recognized as a product, Mem. P. & A. Supp. Def.'s Mot. Summ. J. 18, and argues that the claim is so broad that it reaches all downstream acts that use the processed image information, so the "disk product" is insufficient regardless. *Id.* at 14.

As in 09-cv-1864, the Court believes that in light of the competing expert reports, the question of what constituted a product in the 1980s is a question of fact not amenable to summary

judgment. *See* Mem. Op. at \_\_ *Hyatt v. Lee* (No. 09-cv-1864), ECF No. \_\_. However, the question of whether or not Mr. Hyatt's examples cover the full scope of his claimed inventions is amenable to summary judgment. Here, as there, the Court finds that the full scope of the product claims are not supported by the specification. Though there is a very high degree of overlap in these cases, the parties do make distinct arguments. The Court will address these arguments below.

In this case, Mr. Hyatt argues "the general rule is that in the predictable arts such as computers, memories and products . . . a single example can be sufficient to describe the full scope of the claimed subject matter." Pl. Gilbert P. Hyatt's Opp'n Def.'s Mot. Summ. J. 12, ECF No. 57. This is not a complete view of the law. As Mr. Hyatt provides examples rather than specifies the precise contours of his invention, the Court sees this as analogous to determining if the examples are representative species sufficient to disclose a genus. *See Hynix Semiconductor, Inc. v. Rambus, Inc.*, 645 F.3d 1336, 1352 (Fed. Cir. 2011). Accordingly one or more examples *can* be sufficient for a broader scope. It is certainly the case that "whether a patent complies with the written description requirement will necessarily vary depending on the context," *Ariad*, 598 F.3d at 1351, and that there are several factors that can play into this, including "existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, the predictability of the aspect at issue, and other considerations appropriate to the subject matter." *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005). However, the Federal Circuit avoids bright-line rules in this area, *Ariad*, 598 F.3d at 1351, and explicitly notes its avoidance using the precise example of "the number of species that must be disclosed to describe a genus claim" as "this number necessarily changes with each invention, and it changes with progress in a field." *Id.*

The court in *Ariad* goes on to articulate the "broad principles" that do hold true across all cases including the following: 1) "a constructive reduction to practice that in a definite way

identifies the claimed invention can satisfy the written description requirement;" 2) "actual 'possession' or reduction to practice outside of the specification is not enough . . . it is the specification itself that must demonstrate possession;" and 3) while the invention need not be recited *in haec verba*, "a description that merely renders the invention obvious does not satisfy the requirement." *Id.* at 1352. Notably, the Court goes on to explicitly reject the notion of a "super enablement" standard for chemical and biotechnology inventions. *Id.* Thus while the memory architecture invention is in a different field from chemical or biotechnical inventions, the difference in fields does not create a difference in law with respect to § 112. Ultimately, the sufficiency of written description support is a case specific inquiry and may certainly take into account the predictability of the art, but it also takes into account the size of the genus and nature of the species described. *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1300 (Fed. Cir. 2014). While in a given case any number of factors could be relevant, the central inquiry is the same: did the inventor reasonably convey to those skilled in the art that he or she had possession of the claimed subject matter as of the filing date. *Ariad*, at 1351.

Mr. Hyatt's next argument is that the product claims are not unduly broad as they are limited by virtue of their being dependent claims. Pl. Gilbert P. Hyatt's Opp'n Def.'s Mot. Summ. J. 14. Thus, while defendant argues that there is "no limit" on these claims, Mem. P. & A. Supp. Def.'s Mot. Summ. J. 16, Mr. Hyatt uses the example of claim 144, explaining "the product must be made in response to output image information that is generated in response to weighted scaled information which is in turn generated by weighting and scaling two-dimensional processed image information as recited in parent claim 82." Pl. Gilbert P. Hyatt's Opp'n Def.'s Mot. Summ. J. 15.

It is true there is a limit to Mr. Hyatt's claims. The dependent product claims do indeed rely on independent claims, as is evidenced by their very text. Contrary to Mr. Hyatt's conclusion

though, this does not necessarily make them acceptably narrow. This is because Mr. Hyatt's language in his dependent claims is broad. Mr. Hyatt's own example of claim 144 is illustrative. It reads "[a] process of operating a memory system as set forth in claim 82, further comprising the act of making a product in response to the output image information." A925. While the claim is limited to products generated from the process in claim 82, its language still covers a wide range of products. Defendant argues it is this range of products that causes Mr. Hyatt's claims to lack written description support. Specifically, defendant argues that Mr. Hyatt's claims explicitly include things far more complicated and intricate than described in the specification, including video game disks and movies. Def.'s Reply Supp. Mot. Summ. J. 3, ECF No. 63.

Moreover, an analogy to Mr. Hyatt's claims may be someone claiming to have invented a manufacturing tool and, in a dependent claim, stating "a process of operating the manufacturing tool as set forth in claim $X$, further comprising the act of making a perpetual motion machine." Just because that hypothetical claim is dependent and the specification may well teach both how to make and operate the manufacturing machine as well as several things it can manufacture does not mean it would have written description support for making a perpetual motion machine. Accordingly, dependence alone cannot be the basis for written description support. It is clear the language of the product claims are indeed broad, reciting the general act of making a product rather than something narrower.[3] A925-28. This broad language is not inherently cured by its being in a dependent claim, though a claim's dependent status may provide limits. Thus the question is not if there are any limits for the claims, but if the claims are sufficiently limited that the specification teaches the full scope of the claims.

---

[3] In addition to the broad plain language of these claims, defendant notes that to have meaning they must be broader than the claims they reference—claims that at points already recite displaying images. Mem. P. & A. Supp. Def.'s Opp'n Gilbert P. Hyatt's Mot. Summ. J. 18.

12

Following *AbbVie* and *LizardTech*, the Court turns to the question of whether or not Mr. Hyatt's examples cover the full scope of his product claims, allowing him to maintain a genus. Mr. Hyatt's examples of products he argues are described by the '062 application are a signal product, a synchronization and timing signal product, a disk product, and a display product. Pl. Gilbert P. Hyatt's Opp'n Def.'s Mot. Summ. J. 13. As noted, there is dispute as to whether one of ordinary skill in the art would have considered these to be products, but assuming, arguendo, they are, the Court looks to the specification of the '062 application to determine if there is sufficient written description for the full scope of the claims. *Ariad*, 598 F.3d at 1351 ("[T]he hallmark of written description is disclosure . . . [T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.").

The Court finds there is not sufficient written description for the disputed product claims. While his claims are not, strictly speaking, without limit, they encompass far more than can be found in the specification. As an example, Mr. Hyatt claims the specification covers making a disk containing a video game. Expert Report of Brad Hite 12, ECF No. 57-3. As defendant notes, there is no description in the specification of creating such complex products. Def.'s Reply Supp. Mot. Summ. J. 3. Unlike the application in 09-cv-1864, the '062 application does not even have an "Arcade Game Application." In short, nothing in the specification would demonstrate to one of ordinary skill in the art that Mr. Hyatt possessed the ability to make video game disk products. Additionally, Mr. Hyatt's claims do not stop at his examples. Rather, his broad language captures all manner of downstream products. As the claims look to using processed image information, to "make a product," A925-28, they necessarily cover any image processed product that could be made with the systems detailed in the independent claims—including products that did not, or still

do not, exist. Mr. Hyatt cannot show he had possession of the claimed invention in part because his claims are so broad as to cover things that he could not logically have possessed.

The Court sees the logic from *AbbVie* applicable here: "[w]ith the *written description* of a genus . . . merely drawing a fence around a perceived genus is not a description of the genus. One needs to show that one has truly invented the genus, *i.e.*, that one has conceived and described sufficient representative species encompassing the breadth of the genus." *AbbVie*, 759 F.3d at 1300 (emphasis in original). Mr. Hyatt's examples do not cover the broad, albeit not unlimited, breadth of his claims. Accordingly, the Court finds summary judgment for the defendant is proper with respect to claims 144-46, 148-50, and 155-62.

## IV. PROVISIONAL OBVIOUSNESS-TYPE DOUBLE PATENTING REJECTION

The Board issued a provisional obviousness-type double patenting rejection for claim 45. A1343. Specifically, the Board found that claim 45 of the '062 application was an obvious variation of claim 45 in application 08/471,712 (the '712 application). These claims both detail memory systems. The difference between the two memory systems is that while claim 45 in the '712 application weights image information, the '062 claim weights and scales it. *Id.* Defendant claims that scaling was well known at the time and an obvious variation, so the difference is not patentably distinct. Mem. P. & A. Supp. Def.'s Mot. Summ. J. 18-21.[4]

Mr. Hyatt argues that the Board misapplied the test for obviousness-type double patenting. He argues that in *Berg*, the case cited by the Board, the applicant sought allowance of a broad genus after having been issued a patent on a narrow species within that genus. Granting the broad genus application would have the effect of extending the patent on the narrow species. *See In re*

---

[4] A side-by-side comparison of the claims can be found on pages 7-9 of the Defendant's Reply In support of their Motion for Summary Judgment. However, the parties do not dispute the difference between the claims. Rather, they dispute if that difference makes the two claims patentably distinct.

14

*Berg*, 140 F.3d 1428; Mem. P. & A. Supp. Gilbert P. Hyatt's Mot. Summ. J. 25-28. Here, claim 45 of the '062 application is narrower than claim 45 of the '712 application, as it requires both weighting and scaling. *See* Def.'s Reply Supp. Mot. Summ. J. 7-9 (quoting the two claims side by side). Mr. Hyatt thus argues that the obviousness-type double patenting rejection is improper as, unlike *Berg*, he did not push through a narrow species followed by a broader genus. Mem. P. & A. Supp. Gilbert P. Hyatt's Mot. Summ. J. 27-28.

The applicable legal test, as Mr. Hyatt notes and defendant does not dispute, is the "one-way" test. Contrary to Mr. Hyatt's position, the pertinent question is not which, between the '062 and '712 claim, is narrower. *Application of Vogel*, 422 F.2d 438, 442-43 (C.C.P.A. 1970) ("It is further noted that viewing the inventions in reverse order, i.e. as though the broader claims issued first, does not reveal that the narrower . . . process is in any way unobvious over the broader . . . invention disclosed and claimed in the instant application."). Rather as previously quoted, "if the scope of the application and the patent claims is not identical, the court must ask whether the former defines merely an obvious variation of the latter." *In re Berg*, 140 F.3d at 1432.

Accordingly, the Court looks to see if the addition of scaling is an obvious variation to the memory system. Defendant's expert explained scaling and expressed his opinion that it was well known at the time of the filing:

> In October 1984, weighting and scaling were well-known methods used in processing spatial-domain image data. It was well-known in October 1984 to process image data such that the pixel data for a group of pixels was multiplied by a fixed set of weight values (called the "kernel"), and those products were summed, scaled, and written back into image memory. Since the pixel data and the weight values were both integers, the sum of the products ordinarily was too large to be displayed. The results therefore were scaled down to fit within the range of the display. Thus scaling was the known process of multiplying data by a constant (usually less than unity) so as to make the values fit into a prescribed range. For 8-bit data, for example, the range of allowable values is from zero to 255. Since the sum of products operation used in spatial filtering produced values outside that

range, the computed results needed to be scaled to fit before they could be stored in an 8-bit memory.

Expert Report of Dr. Kenneth Castleman ¶ 16, ECF No. 59-2. However, Mr. Hyatt's expert stated that he "was aware of scaling being applied to digital filter processing, but not to processing spatial domain image data."[5] Pl. Gilbert P. Hyatt's Reply Supp. Mot. Summ. J. 19, ECF No. 66. That is, while there appears to be no dispute as to Dr. Castleman's explanation of what scaling is and how it was used, the parties' experts disagree on whether or not it was well known at the time *as applied to spatial domain image data.* The Court thus finds claim 45 contains an underlying disputed fact to be resolved at trial.

## V. REQUEST TO WITHDRAW CLAIMS OR GRANT SUMMARY JUDGMENT TO SUCH CLAIMS

Mr. Hyatt is no longer challenging the Board's decision with respect to claims 17, 18, 20, 72, 74, 81, 85, 125-131, 134, 135, 137, 143, and 147. Pl. Gilbert P. Hyatt's Reply Supp. Mot. Summ. J. 20. As the arguments and facts are the same, the Court grants defendant's motion for summary judgement with respect to these claims for the reasons specified in section V of the Memorandum Opinion in case 09-cv-1864.

---

[5] Defendant argues that this answer is from an "untimely" correction. Def.'s Reply Supp. Mot. Summ. J. 12-13. Mr. Hyatt is correct that the answers were changed in accordance with Rule 30(e) of the Federal Rules of Civil Procedure. *Compare* Fed. R. Civ. Pro. 30(e) *with* Email re: Corrected Dep. Bradford Hite, ECF No. 66-4. Additionally, the Court notes the dispute over whether scaling was applied to processing spatial domain image data may be emblematic of the relative infancy of the field at the time. While the parties did not directly address the nature of the field in the 1980s, the expert reports imply this field was different as compared to the present. *See, e.g.*, Expert Report of Dr. Kenneth Castleman (prefacing many explanations and definitions "in October 1984...").

## VI. CONCLUSION

For the reasons stated herein, defendant's motion for summary judgment will be granted in part and denied in part. Plaintiff's motion for summary judgment will be denied for the reasons stated herein. A separate order consistent with this opinion will be issued on this date.

Signed this 23rd day of August, 2016.

*Royce C. Lamberth*
ROYCE C. LAMBERTH
United States District Judge